Commissioners, et al. Argument not to exceed 15 minutes for appellant and 15 minutes to be shared by appellees. Ms. Foster, you may proceed for the appellant. Good morning, Your Honors. May it please the Court, my name is Mary Foster and I represent Mr. Michael Darden in this matter and I would be requesting a five minute rebuttal time. The matter before this Court, we assert three specific errors that occurred within the underlying case that brought us here today. The first one discusses briefly the procedural, the improper standards for which the lower court ruled on the motion to dismiss filed by the plaintiffs, excuse me, by the defendants. Our second one was the procedural errors at the motion to dismiss stage. And third, the failure to take judicial notice of certain factors in the case, due process issues with respect to the systemic racism that we believe exists and has already been acknowledged and documented. I'm sorry, the failure, what they failed to take judicial notice of was the systemic racism or particular documents about it? A particular portion of it. With regards to the systemic racism issue, one of the portions of that was whether or not the jobs and family services received federal funding and that we did not state that they received federal funding. So you're focusing specifically on whether they received federal funding? Correct. To establish a factor that they claimed. That was a specific issue that was raised. Did you cite anything? What was it that you cited that they should take judicial notice of that would show the federal funding? Well, we're asking that in this particular case, that wasn't an issue that we actually brought up. That was an issue that was brought up by the court in dismissing the case. But it's an element of the claim. You would have to plead that, wouldn't you? Well, there is a case, Your Honor, that states specifically with regards to taking judicial notice, things that would be inherent with knowledge in the system, which was under Alexander V. Zonderval as well as Teres Pesco v. Columbia College. I would think you would want to say, here's a statute that says Congress is going to send money to Montgomery County or here's an HHS document that says we are hereby sending X amount of money to Montgomery County. Did you specify anything of that sort? In our case, no, Your Honor, because we felt that that was an issue that was not under dispute. An issue for which the courts have in past times recognized taking judicial notice. Did the defendants raise it in their motion to dismiss? No, that was raised in the court's decision. It was not raised in their motion to dismiss. That's why we did not address it. When the court addressed it at the dismissal stage, that's when we addressed it in our brief to the court concerning that. Irrespective of even that particular matter, Your Honors, there are several arguments here. The improper standard in reaching the conclusion requires us to have a heightened pleading requirement prematurely. This is at the initial stage. This is not a motion for summary judgment after we've had opportunity for discovery and things of that nature. We've clearly alleged the issues before the court. Our issue was conspiracy to commit torturous interference of a parental right. That's a right that's been recognized by the United States as a fundamental right to raise and have your children. Wasn't the court's issue with that claim that there wasn't any allegation that the relevant defendants had acted without privilege? I mean, they had been acting within the system, right? Well, the issue, Your Honor, is that the conspiracy involved a judge, the underlying judge that was in the matter, that there was ties to the benefiting party in this matter, which were the Kingstons, in adopting and taking a child. And this was a situation where the judge controlled everything, and everything went to the judge for his ultimate decisions. But there were financial ties, there were personal ties to the Kingstons for which we couldn't... There has to be a conspiracy to commit some underlying tort.  And the underlying tort is, what, taking the child, right? Yes, interfering with parental rights, yes, Your Honor. What, but you have to be, you have to know, my understanding is you have to act without knowledge that you have privilege or something, right? You're acting without privilege. You know you're acting without privilege. Well, it's... Why don't they have privilege here? They're all part of the... You don't have privilege to commit a crime. You don't have privilege to... No, you're presupposing a crime. Yes. That's what I think Judge Malbandian is asking. Okay. There's no presupposing a crime. No, what we're presupposing is that there was a system in place, a place that a person should be able to present themselves where the system is actually protecting the integrity of the process and not violating people's due process rights. But if the individuals within the system, from top to bottom, are all in cahoots together, are all coming to a decision outside the parameters of the court and making sure that every step of the way, what they want is getting done, there's no way for us to be able to say, oh, there was the crime right there. We can see it clearly if you look at it. But we're not even at that stage. We have documentations and evidence that have supported that these things were taking place that we didn't know of that goes to the race judicata issue until after his parental rights were already stripped away. The client somewhat, as the law calls it, slept on his rights. Did he not? Actually, no. I don't believe so, Your Honor. He didn't act to take custody of the child early? Actually, Your Honor, he did. He knew that the guardian ad litem had already? Actually, that's part of the issue that we have is that the underlying court, in writing its decision, made a decision on the facts of the case in their favor rather than the facts that we actually alleged. The facts that we alleged was that Mr. Darden, as soon as he found out that the child was his, because they called him months, they made one phone call to him when he was in North Carolina and said a woman that he had a one-night affair with was pregnant with his child. And he wasn't even in the state. When he came back today, he was like, well, I don't want to go through all this until I know that the child is mine. That's a common sense thing. If someone had a one-night affair, not saying it is a right thing to do or whatever before this court, I'm not challenging any of that. But I'm saying if somebody had that type of an arrangement, I would be not quite sure either. I wouldn't want to take the necessary steps. When he was told that there was a hearing for him to come and participate, he showed up to that hearing. He immediately that day went and filed for, he submitted himself for paternity testing. He did that. And the day, literally the day he found out that the child was his, he filed for custody. And at that precise moment, two days later, they filed for permanent custody of the child. And that is kind of unusual. I mean, there's a lot of things that happened in that lower case that we didn't bring because we're not trying. We know we can't undo the court's decision. We're not trying to. But what we are trying to do is to put a place, something in place where we can rectify some of the wrong that was done here. And that's the fact that they were able to adopt this child. They had gone through that much for them to be able to adopt. They fast-tracked it. They did all of those things to ensure that Mr. Darden could not get his child. He followed what they asked him to do. They thwarted him at every step of the way. There was nothing that had compelled them that according to the law, if you look at the law, and, you know, you are familiar with the requirements is to strip someone of their parental rights. They circumvented all of that. But, of course, the judge who was involved in the matter, who was the presiding judge, wrote a 23-page summary as to why they are better parents than the client. Okay. Thank you. Thank you, Ms. Foster. You'll have your rebuttal time. Thank you.  Appellee's counsel. I please the court. My name is Louise Griffin. I'm here with Michael Hawkins, and we represent Bridget's Path and Jill Kingston as its CEO. Before delving into the issue of race judicata, which will be Bridget's Path portion of the argument today, Bridget's Path would be remiss if it didn't briefly address two preliminary issues, both of which are fatal to plaintiff's complaint. What is your client? I'm not even sure I understand. What counts is your client implicated in? And that's one of the issues that I was just about to bring, Your Honor. None. Our client is implicated in none of the counts. Throughout the complaint. Is this like an advisory argument? No, Your Honor. What? Did you get served with the complaint? Yeah, we got served with the complaint. We're a name defendant in this lawsuit. But in each of the counts, Bridget's Path is not specifically listed in any of the counts. So it's really unclear as to why we're even in this suit in the first place. And my second issue that is also fatal to plaintiff's complaint in this is that this whole matter is improperly before you. It's an inappropriate attempt to challenge a valid state court judgment that involves domestic relations and child custody. Well, didn't we, I mean Holloway answers that, doesn't it? Well, I mean, this court in Are you making a Rooker-Feldman argument? No, not Rooker-Feldman. I'm saying more like in Stevens v. Hayes, which is a Sixth Court case. It states that it has been the Sixth Circuit's consistent policy to refuse to exercise jurisdiction over claims which seek to collaterally attack state court judgment terminating parental rights. She's not really attacking the judgment, right? Isn't she making an argument for money damages based on the alleged mistreatment during the entire process? Which, by the way, wouldn't really have been concluded until the custody judgment. So, it's not like those are arguments that she could have, that he could have raised, that Mr. Darden could have raised in his, during his custody fight, right? Well, in the complaint This goes to the res judicata, too, because I'm confused about My understanding now is he's raising claims for money damages. He's not asking, he can't challenge the custody determination, right? So, why is that res judicata? I don't think he could have brought the money claims in the custody proceeding. Could he? It's the res judicata. The issue is that each of the claims that he is making in this case, for the constitutional claims, the tortious claims, each of which, especially in Bridget's path case, either were or could have been raised in the first argument. So, let me get this right, because I'm confused. He could have brought a claim for civil conspiracy against non-governmental entities in his custody proceeding for money damages? Well, he actually raises the conspiracy issue in the hearing. But can you get a judgment for money damages against a non-governmental entity in a custody dispute that involves the county? Can he obtain that judgment? Because my understanding is that's the judgment he wants here. He wants a civil, for example, he's got a bunch of claims. He wants a civil conspiracy finding, a tort, and gets money damages for that. Can he get that in the custody? Could he have gotten that in the custody dispute? Your Honor, I'm honestly unsure about that, but I do know... Isn't that what res judicata is all about? No, Your Honor. With respect to what he's actually asking for, he's not only asking for monetary damages, he actually asks in his complaint to deem void all decisions that terminated his parental rights. So he is actually seeking for this court to involve itself in the actual decision. But that's one of the things that he's seeking. But if that's not all of the ones, then there may be claims that we can consider. He raised in his complaint a conspiracy theory about, or in the actual hearing itself, a conspiracy that Jill Kingston was receiving preferential treatment. The court actually reviewed that. He was able to present evidence on that. And the court looked at that and said, you know, there is no evidence here. So if there was a claim, he then could have pursued that claim. And he could have appealed and said, hey, he could have brought that issue up on appeal, as you are able to. One question, because I know your time is up, and we've got to get to some other people here. The res judicata argument, is it... I take it it's an alternative argument for affirmance? Or it's not... The claims were dismissed for failure to state a claim. Is that right? Are there any claims that were dismissed only on res judicata? For Bridget's path, it was a res judicata issue, is what the court decided. However, he could have dismissed for failure to state a claim. Okay, but it would be a 12 v. 6 if you weren't really named in any of the counts, right? Correct. Okay, thank you. Thank you, Your Honor.  May it please the Court. David Scott on behalf of Jill and Nick Kingston. Your Honors, I may pick up where Judge Nalbandian had left off as far as the basis for the dismissal of claims other than res judicata. With respect to Jill and Nick Kingston, my clients, the complaint is not explicitly clear, to be honest, regarding what is alleged relative to Jill and Nick Kingston. There's no allegation, for example, in Count 4, which is that civil conspiracy tortious interference claim. There's no allegation of any fact that Jill and Nick Kingston did anything... First of all, that they had any duty to Mr. Darden, and secondarily, that they deviated from that duty. There's no allegation to that effect. The trial court, the district judge, was correct in dismissing that claim. There must be an underlying tort claim. Again, as Judge Nalbandian pointed out, there must be an underlying tort claim in order to have a civil conspiracy claim. The underlying tort, if the underlying tort claim fails, the conspiracy claim fails. And that's exactly what we're dealing with here. What happened is the claim for civil conspiracy derives from and depends on successful prosecution of the underlying claim. The claim in this case, Revised Code Section 2307.50b, there's no allegation that the Kingstons did anything improper. There's no allegation sufficient to establish any of the facts necessary to even plead an underlying tort against Jill and Nick Kingston. So I think the general allegation is that the Kingstons conspired with the state actors to take custody of the child, is my understanding. That would be a generous interpretation, but not inconsistent. OK. That is just not set out in the complaint? Is that the argument? It's not set out. Correct, Your Honor. It's not set out in the complaint. And then, like I said, the court being generous. Whether it's cognizable or not. Yes, Your Honor. Am I right that the tort depends on some kind of knowledge or lack of privilege? Is that right? Indeed, Your Honor. Revised Code Section 2919.23, essentially it's depriving one of their child, knowing that you lacked privilege. OK. Yes. Do I need to allege that in the complaint? What do I need to allege in the complaint on that tort? Because it's hard to allege. I don't know what was in somebody's mind, necessarily, if I'm the plaintiff. So what do I have to put in there in order to get over that knowledge requirement? Indeed, Your Honor. If I were to counsel a plaintiff's attorney on how to properly plead this, one way. So the question is how would one plead intent, right? How would one plead intent, for example, in a fraud case, right? Because that's intent being an element. How does one plead that, right? Under Rule 9. How do we do that? Well, you do that by alleging facts, operative facts, that if deemed to be true for purposes of 12b-6, indeed could state a claim. That would be one way to do it, Your Honor. Which didn't happen here. There's no even effort, no fact of any kind, alleged that Jill and Nick Kingston, simply by being adoptive parents, loving their child and wanting to adopt that child, which they successfully did, wanted to keep their child. That's the crux of, I believe, the Court's point here, which is 2919.23 requires knowledge that you lack privilege. This is the exact inverse. The Kingstons had privilege. They had custody of the child by law, and then they adopted the child. Do you need any part of the race judicata rationale to prevail? I would respectfully posit not, Your Honor. And the reason for that is the other claims that mention, I wouldn't even say that purport to state a claim, the other claims that mention the Kingstons would be Count 5 and Count 6. Count 5 being intentional infliction of emotional distress. The Count 5, intentional infliction of emotional distress, is even more sparse than the civil conspiracy claim. There are no facts, operative facts, alleged against the Kingstons in that claim. That claim is properly dismissed. The other count against the Kingstons is Count 6. That's loss of consortium. In this case, the District Court's analysis was spot on. The plaintiff's complaint fails to allege that the child has any cause of action. There's no primary action, so there can be no derivative action, Your Honors. Secondarily, it fails to allege that the child suffered any kind of physical injury. That's a core element. Ohio classifies filial loss of consortium. That's what we're talking about here. Filial loss of consortium is an element of damages. It's not even a cause of action, Your Honors. Okay, thank you, Counsel. Mr. Scott, are you the right person to answer the question whether the District Court spontaneously raised the absence of the element of federal funding? I was literally reviewing the decision as we were sitting here because I didn't recall that as an issue. Since it didn't really implicate the Kingstons, I can honestly say that's not an issue I focused on, Your Honor. Thank you. Thank you.  Good morning, and may it please the Court. I'm Josh Shaw. I'm here with my co-counsel, Anu Sharma, and we represent the Montgomery County Board of County Commissioners, Montgomery County Department of Job and Family Services, Joel Good, Lacey McGuire, Adam Masch, Tom Schutzman, and Lisa Bruder, whom we'll collectively refer to as the Montgomery County defendants. The issue in this case is that this plaintiff's chance to litigate his claims has come and gone. Our issue on this appeal is waiver, and the fact of the matter is that this plaintiff did not defend any of the claims, or rather the majority of the claims, before the District Court. This Court's well aware that it will not reverse District Court judgments based on facts or arguments that could have been... You have to oppose a motion to dismiss, right? You don't waive anything by not... Well, you waive something, so let me put it... But you don't waive everything by not... You can't enter a motion to dismiss by default, right? You agree with that? Yes. Okay, so what is it that you waive when you don't file an opposition to a motion to dismiss? Well, this plaintiff did file an opposition... I know, but your argument is waiver because of what? Specific arguments that weren't raised? Waiver because we raised the arguments relied upon by the District Judge in dismissing this plaintiff's claims, and now on appeal the plaintiff is attempting to bring arguments that could have been raised before. In particular, you heard a moment ago from the Plaintiff's Counsel that there was an issue with the Title VI claim, which was the second claim under this plaintiff's complaint. And the fact of the matter is that my clients in our motion to dismiss did raise this issue. We argued to the District Court that the plaintiff failed to allege the fact of federal government funding as well as intentional discrimination, which were two essential elements of that claim. That was not defended by this plaintiff. May I ask, Counsel, you say you argued it in the brief? Correct. You did raise it? We did raise it in our brief to the District Court. It wasn't spontaneously raised in the District Court's opinion? Correct. Now, with respect to the arguments raised by the Montgomery County defendants, again, we argued and challenged every single one of the plaintiff's claims in our motion to dismiss. And there were seven claims that went unanswered by the plaintiff with respect to the defendant's arguments. And those claims were Count 1, the individual Section 1983 claim, the Title VI claim, which we just discussed, the 14th Amendment due process claim, loss of consortium, punitive damages, the Monell claim under 1983, and finally Respondent Superior. And again, there was no response given by the plaintiff to any of these. And then on top of that. So you're saying the plaintiff never opposed, never, did the plaintiff file a brief in opposition to the motion to dismiss? Correct. The plaintiff did file a brief in opposition. And you're saying the plaintiff didn't say, didn't challenge the federal funding issue, for example? Yes. And, Your Honor, with respect to the. . . Did he raise the judicial notice issue? The judicial notice issue, I think, was raised on appeal. I don't recall. . . Not in the court below. Correct. Yes. And with respect to the district judge's decision, the court will see, with respect to the 1983 claims, that the district judge even makes mention of the fact that the plaintiff didn't file a response to the arguments submitted by my clients in this case. And then with respect to the remaining two claims of the plaintiff's complaint, counts four and five, alleging civil conspiracy and intentional infliction of emotional distress, those weren't briefed to this court. And again, the parties have a right to have their arguments heard and fully vetted by the district court, as well as this court. And between those failures to defend at the district court level and before this court, that hasn't happened. And even if the court were to consider the merits of this plaintiff's claims on appeal, the district court judge's decision was well-reasoned and should be affirmed for the reasons stated in our brief, as well as the district court judge's decision. Thank you. Rebuttal? Thank you, Your Honor. In our briefs to all of the counsel in this matter, we address every issue that they raised. Why they didn't see it, I'm not sure. But in terms of whether or not the issue of whether or not that we responded to the spontaneous issue of funding, that was never brought up before his decision. And that's when we addressed it, and we addressed it in our brief to this court. It was not addressed at the lower court level. That's first and foremost. In terms of Jill and Nick Kingston's, you know, part and partial to this, and Bridget's path, why they're brought into it, it's because of the whole conspiracy. It was alleged in our complaint, and we did so thoroughly, that it was the judge and county agencies that met with Jill Kingston that helped create Bridget's path. There were funding, there were meetings where the judge met with Jill Kingston and met with Ms. Good and all the other counties in order to create Bridget's path. Bridget's path is kind of the poster child for their interests, the interest in this situation. And in terms of them having standing at the lower case, sir. What did they have to do with what happened to your client? What they had to do was that they were given preferential treatment because of the bias. They all decided that they wanted, they were foster parents. Foster parents don't have rights, sir. Didn't Bridget's path come along later as an organization? No, sir. It was already enacted. They had had their first, I think, I alleged this in the complaint too, their first six or eight kids into Bridget's path at the time in which my client. I'm saying Bridget's path and the Kingstons in terms of what their roles were and what your... Jill Kingston was the CEO and president of Bridget's path. The Kingstons jointly were the foster parents of the child. It was placed in their care while this whole situation. They didn't have standing or rights. Foster parents don't have standing or rights. The county has standings and rights with regards to a child. They only became having rights once they were allowed to be adopted, which was fast-tracked and everything else. Because I've never seen an adoption go that fast. Why? Because we tried to intervene. We filed a motion to intervene in the adoption before we knew it was already done. And that's when we had found out about everything that had transpired. And we were trying to bring it to fruition before it even got to the federal court level. And that was after the Supreme Court and all that had come back. Because he didn't argue any of those things. Because he didn't know all those things existed. He didn't know the financial ties. In fact, there were meetings with the board of county commissioners. And they were fully aware as well, the defendants. We're going to leave that there. But at the end of the day, Your Honor, this matter... Are you attacking any of the judgments from the state court? No, we are not. At this point, we're not attacking the judgments. We're saying that the judgments were procured by nefarious means. We're saying that the judgment itself, we can't attack. We can't undo it. There is no rights in the state of Ohio to get back parental rights. So nothing we do, nothing that this court does will restore Mr. Dart and his parental rights. Even if it shows that they were in conspiracy. That's just the way the law is, unfortunately, at this time. So at this point, we want it noted that this... It should be taken note, Your Honor, that you can't just have all these financial interests and just take and snatch someone's child. Every procedural thing that should have taken place was not. And those are the things that we were... We tried to outline some of them in our complaint. And those are the things that can be flushed out through more discovery. Counsel, I wanted to ask you, as I understood you a few moments ago, that Bridget's Path was already in existence before the birth here. But your own brief says at page 18 that the birth was in January of 2017. And then it says at page 25, Bridget's Path opened its doors at the end of 2017 and took its first baby two days before the end of the year. So which is it? No, actually, Your Honor, I must have misunderstood what you're saying. Bridget's Path was there at the time this all took place. What I'm saying is that the judge was instrumental. Well, okay, but the stuff I just read you from your own brief says that the child was born in January of 2017. Yes. And Bridget's Path did not open until the end of 2017. Is that correct? I was reading from your brief. I know in the January, I mean December prior to January, Bridget's Path was already open. January was the date. It might have been misunderstood, sir. Bridget's Path was actually in, it was in flourishing at the time that The baby was born? It was kind of, I believe so. But I know at the time in which the hearing took place for my client to find out, Bridget's Path was in. The hearing is until 18. Yes. That's correct. But just so we get it straight, unless you had a typo in your brief. And it could have been, sir. The baby was born in January of 2017.  Bridget's Path opened at the very end of 2017. Okay. Is that correct? Yes. Well, I know that's when they took his first child, yes. But during that time frame, Your Honor, they had been meeting with the judge and everything else, the same judge that presided over this case. And in the brief itself, in the court's decision, it raised the issues of the court reporter. And it was basically like they were taking their facts as true rather than just assuming that we made a cognizable case. It's not about if we were right or wrong. It was whether or not we stated a claim, a legitimate claim. And at that time, we did. The court reporter was the judge's wife. Okay. Okay. Thank you, counsel. Okay. Thank you, sir. For your briefs and arguments, the case will be submitted.